**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPECIALTY SILICONE PRODUCTS, INC.,<br><br>               Plaintiff,<br><br>     v.<br><br>JASON SAVARIA,<br><br>               Defendant. | Case No. _1:25-CV-0463 (AJB/PJE)_<br><br>Civil Action<br><br>**VERIFIED COMPLAINT FOR IMMEDIATE AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES** |

Plaintiff Specialty Silicone Products, Inc. ("SSP"), through its undersigned counsel, files this Verified Complaint for Immediate and Permanent Injunctive Relief and Damages against Defendant Jason Savaria ("Savaria"), and states as follows:

1.     This is an action brought against SSP's current team member Savaria for violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), breach of contract, and replevin, due to Savaria's brazen act of cybertheft against his employer.

2.     Savaria is a Tool and Die Maker I (also known as a machinist) employed by SSP working at SSP's production facility in Ballston Spa, Saratoga County, New York.

3.     As discussed further below, on April 8, 2025, SSP obtained definitive and incontrovertible evidence that on April 4, 2025, Savaria utilized a USB flash drive to copy **thousands** of electronic documents and files from SSP's information system, removing them from SSP's protected network.[1] The overwhelming majority of the files that Savaria has misappropriated for his presently-unknown purposes contain valuable trade secrets and other confidential information related to SSP's business, products, production processes,

---

[1] The documents and files that Savaria took are generally described below, as appropriate, as the "Materials."

1

customers, research and development, that Savaria has no legitimate business reason to use or access.

4.      As a result of Savaria's various acts of misappropriation and theft, which are still coming to light in real-time even as of this filing, Savaria has the roadmap to key portions of SSP's business to start or enhance a competitive enterprise. Or, and perhaps more likely, if he allied himself with a competitor that has the existing machinery or resources to obtain it, he could begin producing copycat products to compete against SSP at virtually any minute.

5.      Savaria's actions follow closely in the wake of an extended series of disagreements between Savaria and SSP's management, during which Savaria has raised concerns over the safety of SSP's facility that the company has since rebutted.

6.      SSP has addressed all of these concerns appropriately with Savaria and SSP's other team members. However, Savaria has made clear that he is disgruntled due to his perception that SSP has failed to address his concerns, to the point where colleagues have openly criticized Savaria for his grievances and manner of dealing with management, which they feel are inappropriate.

7.      Savaria's grievances with SSP boiled over to the point where he publicly told several of his colleagues in an open setting that if SSP's Operations Manager, Alain Cotnoir, tried to talk to him, Savaria would "punch him in the face."

8.      With this in mind, SSP does not know precisely what it is Savaria intends to do with the **thousands** of electronic files he has removed from SSP's protected network. However, the rapid escalation of Savaria's conduct and grievances against SSP clearly demonstrate that he intends to now use these documents for some purpose inimical to SSP. Whether that will be publicizing them on the internet to destroy SSP's business and

reputation, "selling" them to a competitor, or using them to "fish" for information that may support his to-date unsubstantiated safety concerns, SSP does not know.

9.      To be clear, though: this present action is **not** about the safety of SSP's facility or preventing Savaria from raising his concerns to appropriate authorities. Should Savaria believe authorities should address his perceived issues with SSP's facility, he is of course able to lodge any appropriate complaints free from any actual or threatened form of retaliation. However, even if his unilateral purpose is benign and centered around his safety-related advocacy, he is not entitled to just simply steal SSP's confidential and proprietary documents and files, which include valuable trade secrets that would compromise SSP's best interests if they fell into the hands of a competitor —whether purposefully or not.

10.      SSP therefore respectfully requests that this Court enter a temporary restraining order ("TRO"), to be followed by a preliminary and permanent injunction, to preserve the *status quo* and protect SSP's confidential and trade secret information from further misappropriation, including by entering an Order requiring that Savaria: (i) immediately cease and desist from using, accessing, disseminating, or copying any documents or electronic files that he obtained from SSP's premises or computer systems, (ii) immediately return the USB flash drive that he utilized to misappropriate SSP's confidential and trade secret documents and information; (iii) produce all of his electronic devices to be forensically examined by a third-party investigator of SSP's choice; (iv) verify under oath in a written declaration or in open court, that he has not copied, or further disseminated any of SSP's confidential and trade secret documents and information; (v) return all other physical materials and objects that Savaria took from SSP's premises; and (vi) take whatever other actions are necessary to bring Savaria into full and complete compliance with his legal

3

obligations under the DTSA and his relevant confidentiality obligations to SSP.

## PARTIES, JURISDICTION AND VENUE

11.    SSP is a New York corporation with its principal place of business located at 3 McCrea Hill Road, Ballston Spa, New York 12020.

12.    Savaria is an individual and current team member of SSP, who according to SSP's employment records, permanently resides in Ballston Spa, New York.

13.    This Court has subject matter jurisdiction over SSP's claim against Savaria for violation of the DTSA pursuant to 28 U.S.C. § 1331. This Court may exercise supplemental jurisdiction over the remaining claims in this Complaint pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as SSP's DTSA claim.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to SSP's claims occurred in this judicial district, among other reasons.

## FACTS COMMON TO ALL CLAIMS

**A.    SSP's Business**

15.    SSP is a silicone-based product manufacturer based in Saratoga County, New York, where its 83 team members work every day from SSP's production facility.

16.    SSP's products include caps with silicone liners, custom formulated silicones, molded silicone parts, and custom silicone gaskets, which are utilized in various end products ranging from medical and laboratory supplies to aerospace and defense applications.

17.    As an example, some of SSP's products are various types of o-rings, which are used to create an air-tight seal around electronic enclosures, and bonded caps used to preserve samples for chromatography analysis:



*See https://sspinc.com/emi-rfi-conductive-o-rings/* (last accessed April 13, 2025).



*See* https://septasource.com/(last accessed April 14, 2025).

18.    While perhaps simple-looking at first blush, the proprietary nature of these products derives from their chemistry together with the manufacturer's production processes. The types of silicone-based products that SSP creates are high yield and are designed to allow very tight tolerances. This allows SSP's products to be utilized in extreme conditions, including space and aviation.

19.    Many of SSP's products are developed to perform under the most extreme conditions, in order to contain any number of volatile chemicals and protect electrical equipment from exposure to the elements in air and space. SSP's customers accordingly

include many of the biggest names in the aviation and defense industries, and SSP's products, while perhaps not the central focus of the average person's eye looking at a plane or satellite, can be found across the world and throughout the atmosphere.

20.    Separate from the advanced materials aspect of its business, one of the largest portions of SSP's annual revenue comes from manufacturing supplies used in a healthcare and laboratory settings, which the company refers to as its Laboratory Products.

21.    In fact, the highest revenue-generating product that SSP creates are caps from its plastic injection molding operation lined with a silicone liner called septa for glass medical vials and other containers, which are composed of both plastic screw caps and silicone-based liners. These caps are utilized for a variety of different purposes, with the primary purpose being sealing containers used for pharmaceutical, chemical and food product testing in a process called Chromatography.

22.    These caps are **incredibly** narrow (about 9mm in diameter), to hold small sample volumes, so that a thin testing needle may still pierce them. The proprietary and difficult aspect of creating this from an engineering perspective is that the caps still need to have the structural integrity to keep the contents secure and contained in an air-tight manner.

23.    While many of SSP's competitors make similar products and compete for the same customers, SSP differentiates itself from many (if not all) of its competitors because instead of sourcing its plastic caps from a supplier for its lining operation, SSP produces some of its plastic materials in-house. Doing so allows SSP to produce its end-product much more efficiently, being able to offer their customers lower prices and earning SSP higher profits.

24.    SSP invested significant resources into researching and developing the best infrastructural parts and assembly processes to develop this plastic injection molding

operation, as well as to establish quality control processes to ensure its end-products are of the highest quality.

25.    In fact, a little over one year ago, the processes that SSP put in place to manufacture its plastic injection molding operation allowed SSP to win business away from a local competitor for a major purchaser. That piece of business now represents approximately 10% of SSP's annual revenue. The competitor that SSP won this business away from is located about 30 minutes away from SSP's own production facility.

26.    For all of its products, not just these caps, SSP derives much of its business value from its production processes, which allow SSP to produce its products efficiently and effectively among a field of competitors. Among a very competitive market, SSP's entire business depends upon being able to produce its products effectively to meet the customer's end-use at the lowest possible price.

**B.    Savaria Accepts Employment with SSP and Agrees to Protect SSP's Confidential Information**

**i.    The Agreements at the Time Savaria Commenced his Employment**

27.    Savaria became employed by SSP on or about April 9, 2019, as a Machine Shop Specialist II, pursuant to an Offer Letter dated March 25, 2019, which Savaria accepted on March 26, 2019. A true and accurate copy of Savaria's Offer Letter is attached as **Exhibit A**.

28.    Recognizing that the success of this industry requires the protection confidential and proprietary information, the Offer Letter emphasized:

7

> Please note that SSP expects you, and all Team Members, to be respectful of confidential and proprietary information you may have learned at any positions you held prior to the commencement of your employment with SSP. SSP expects you not to take any confidential or proprietary information (in any form) from any former employers and expects you not to use or divulge during the course of your employment with SSP any confidential or proprietary information belonging to any former employers. The information you must not use or disclose from former employers includes, without limitation, financial statements or other financial data, as well as sales, gross margin and customer profitability analysis. Also, if you accept SSP's offer of employment, you must not have discussions with other SSP Team Members at any time regarding your current or former employers' customers, particularly with respect to pricing, profitability, and contracted product lines or part numbers. Please be aware that your failure to abide by SSP's expectations with respect to confidential or proprietary information will result in disciplinary action, up to and including termination of employment. Further, while SSP believes it is within its right to extend to you this offer of employment, if issues arise concerning your employability by SSP, then SSP reserves its right to rescind its offer of employment or immediately terminate your employment.

29.    During all times during his employment with SSP, Savaria's job was as a machinist.

30.    As part of the hiring and onboarding process, Savaria received and signed the SSP – Employee Manual Version 13 – 1/16/2019 which provides: "Employee shall take all reasonable action, that SSP deems necessary or appropriate, to prevent unauthorized use or discolors of or to protect SSP's interests in the Confidential Information." A true and accurate copy of the 2019 Employee Manual is attached as **Exhibit B**.[2]

31.    The Employee Manual provides that it shall be binding upon signature by Savaria. *Id.* at p. 45

32.    Savaria signed the Employee Manual on April 9, 2019. *Id.*

33.    The Employee Manual also contains a specific page titled "Receipt and

---

[2] SSP has not located a copy of the Employee Manual dated 1/19/2019. However, the attached exhibit is the Employee Manual dated 12/10/19 which notes the revision on the last page. As set forth therein, none of the clauses relevant to matters raised herein were revised or amended.

Acknowledgment of Employee Manual" which Savaria signed on April 9, 2019. *Id*. at p. 33. In the Receipt and Acknowledgment of Employee Manual, SSP confirms the importance of protecting its confidential information, requiring the team member to again confirm that:

> I am aware that during the course of my employment confidential information will be made available to me, for instance, product design, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is proprietary and critical to the success of SSP and must not be given out or used outside of SSP's premises or with non-SSP employees. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

34.     As part of his employment, Saravia also received a Fraud Policy which he acknowledged receipt of on a yearly basis. The Fraud Policy defines fraud to include the "misuse or stealing of tangible (cash, inventory) and intangible (proprietary product, customer information) assets that can lead to significant losses to the Company.  A true correct copy of the Fraud Policy and the 2024 acknowledgment are attached as **Exhibit C**.

35.     In October 2023, Savaria completed his apprenticeship.

36.     In April 2024, Savaria's became a Tool & Die Maker 1.

**ii.     The Employee Manual is Modified and Superseded by the Team Member Manual on November 7, 2024**

37.     On November 7, 2024, SSP provided its team members, including Savaria, with a Team Member Manual. A true and accurate copy of the 2024 Team Member Manual is attached as **Exhibit D**.

38.     Relevant to the matters raised herein the Team Member Manual confirmed that SSP's business requires that many of the products made by SSP and the way they are made are confidential in nature and that the team members agree not to disclose information on SSP's products, or how SSP made them, to other companies who could use this information

9

to compete with SSP. *Id.* at p. 27, Section 4.1.

39.     Like the Employee Manual, the Team Member Manual contains a specific page titled "Receipt and Acknowledgment of Team Member Manual," which Savaria signed on December 13, 2024. *Id.* at p. 48. In the Receipt and Acknowledgment of Team Member Manual, SSP again confirms the importance of protecting its confidential information, requiring the team member to again confirm that:

> I am aware that during the course of my employment confidential information will be made available to me, for instance, product design, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is proprietary and critical to the success of SSP and must not be given out or used outside of SSP's premises or with non-SSP Team Members. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.
>
> Name (Signature) _____        Date 12/15/24
> Jason Savaria
> Name (Printed)

## C.     Savaria's Growing Resentment Toward SSP and Its Leadership

40.     On November 4, 2024, Savaria submitted  two "Near Miss Reports" to SSP alleging concerns about exposure to smoke and other toxic chemicals and/or substances.

41.     SSP promptly investigated the matter and created a form to capture pertinent information regarding any alleged smoke. All team members in the affected building were trained on completing the form.

42.     There were no reported or documented smoke entry cases until January 9, 2025, when Savaria made another complaint about smoke entering the building.

43.     Prior to the last complaint by Savaria, SSP had conducted a yearly evaluation of Savaria.  Savaria received satisfactory or above average ratings for all criteria except the SSP Beliefs and Values (teamwork) component, which was rated at needs improvement.

Significantly, Savaria's supervisor, Christopher Gravely, was not involved with any of the safety complaints raised by Savaria.

44.    In addition, Savaria was asked to improve on certain areas such as (i) become more involved in preventive maintenance activities at SSP; (ii) be more open to non-machining work orders; (iii) increase communication with the shop team; and (iv) reduce his cell phone use in the shop area.

45.    Savaria was not pleased with his review or his yearly annual increase and bonus as he was of the belief that he deserved a large raise despite the fact that the raise he believed he was entitled to would have put him well above the pay range for his position.

46.    On January 22, 2025, Savaria was observed failing to lock out and tag out a 50" two roll mill at the energy source, creating an immediate safety hazard and subjecting himself and those around him to the threat of imminent harm. As a result of the flagrant safety violation, Savaria was issued a written warning, which he refused to sign.

47.    On February 24, 2025, Savaria filed a complaint with OSHA alleging retaliation due to his reporting of safety concerns. The OSHA process remains pending.

48.    Savaria proceeded to harass and verbally threaten members of SSP's leadership which resulted in a March 27, 2025, written warning about his behavior. Savaria refused to sign the written warning.

**D.    Savaria's Misappropriation of SSP's Confidential and Proprietary Electronic Document and Files**

49.    On April 4, 2025, Savaria got to work early for his shift, clocking in at 5:43 AM.

50.    Security footage reveals that shortly after this, Savaria then began to do work at a computer located on the machine shop floor of the production facility. While sitting at

the computer on the shop floor, in the span of about eighteen minutes between 6:10 AM and 6:28 AM, Savaria copied to a company-issued USB flash drive (*i.e.*, the Drive) **2,065** individual digital documents (*i.e.*, the Materials).

51. About an hour after copying the Materials, Savaria left the plant (hours before his shift was scheduled to end) having performed little actual "work" to SSP's knowledge.

52. SSP's security cameras from the time while Savaria was walking around the plant on the morning of April 4, 2025, show him carrying around the Drive, but do not show him putting it back in his workspace or any other location at the facility.

53. The Drive Savaria copied the Materials to is now missing, and nowhere to be found on SSP's premises.

54. The Materials Savaria copied from SSP's computer system include CAD drawings of many of SSP's products, financial and budgeting information, manufacturing and packaging processes, customer quotes, engineering notes presented during a management business review, and troves of other information that could be used by any number of SSP's competitors to quickly replicate SSP's products and processes. The Materials also include research and development materials and proprietary product formulation information related to SSP's manufacturing processes.

55. Of particular note, a vast number of the Materials relate to both the infrastructural components and quality control processes of SSP's plastic cap manufacturing process, as well as the specific formulations and engineering designs that SSP utilizes to produce its plastic caps.

56. Taken in the aggregate, with the information that Savaria copied, the only thing that a competitor would need to almost instantly replicate SSP's products would be a plastic

injection machine and mold and the unique combination of commercially available attachments, accessories, and automation function which SSP deploys. Such machines and their attachments are popularly used, though not currently used by competitors in SSP's Lab Products market in the proprietary assemblage that SSP has developed. This machinery and the corresponding attachment configuration can be obtained on the open market today for approximately $750,000 and the molds can be created for approximately $150,000. However, the time, effort, and expense to arrive at this combination of equipment knowhow is incalculable.

57.     With this in mind, given SSP's nearby competitor who SSP only just recently used this information to "beat out" for a lucrative line of business, there is no shortage of ways that Savaria could use this information to harm SSP through disclosing SSP's confidential information and trade secrets to this same competitor to "even" the playing field.

58.     Among the thousands of Materials, Savaria also took a number of specific documents known as "CNC" G-code files. These are proprietary files containing virtually the entire production sequence, which can be plugged into a variety of modern CNC mills in order to produce proprietary tooling including but not limited to die plates, cap plates, compression molds, LIM molds, and extrusion dies without any other information.

59.     Additionally, the Materials contain specific price quotes and contacts for a variety of SSP's customers, which include client name, product, price, and quantity information. This information would enable virtually anyone to call one of these customers and match SSP's pricing without any other information needed.

60.     Moreover, many of the Materials include third parties' sensitive information, which information is provided solely to facilitate the production of certain products.

61.     Many of SSP's products are manufactured for aviation companies and military contractors, many of whom are **incredibly** sensitive about the products SSP produces for them.

62.     The Materials that Savaria misappropriated number in the **thousands**, and it is functionally impossible to describe them all here. However, the fact remains that **nobody** outside of SSP has access to these Materials; except, in limited circumstances, SSP's actual customer. The way to which Savaria could use this information to injure SSP either through competition or broad publication is virtually limitless.

63.     As a result, Savaria's acts have not only put SSP's business at risk of unfair competition, but further have caused an immediate threat to SSP's goodwill and longstanding business relationships.

64.     Should Savaria disseminate, sell, or attempt to manufacture these products, the ultimate business ramifications to SSP will be devastating.

**E.     SSP's Reasonable Efforts to Protect its Trade Secrets**

65.     SSP is a wholly owned subsidiary of HEICO Corporation ("HEICO").

66.     To protect SSP's proprietary, confidential and trade secret information, SSP's information and technology ("IT") systems and administration is overseen by HEICO, in accordance with HEICO's robust information security policies and procedures.

67.     Among these procedures, is that all SSP and HEICO employees are required as a condition of their employment to agree to abide by HEICO's information security confidentiality policies.

68.     HEICO and SSP's security procedures include requiring all individuals who need to access SSP's computer system to utilize a specific login and password. Among the

approximately 83 team members working presently at SSP, only 49 have login credentials to access SSP's shared information systems. Access to SSP's shared information system is strictly limited only to those who have a legitimate business need to access the system.

69.    In addition to limiting access generally to the system itself, SSP implements a litany of other security measures to protect its confidential information and trade secrets that are stored on shared storage systems. This includes, but is not limited to, maintaining an active firewall to prevent outside infiltration, and blocking access to all of the commonly used cloud-based storage systems (*e.g.*, Google Drive, DropBox, iCloud) to prevent employees from digitally transferring documents from within the system to any personal accounts. Additionally, SSP has active monitoring and alerts in place to prevent employees from exporting large amounts of data outside of its protected system.

70.    Additionally, as particularly relevant to the issues in this Complaint, SSP only allows certain computers that have a legitimate business need to utilize USB ports.

71.    Even among the few computers that do have functioning USB ports, they are limited to only being able to work with specific USB devices that are registered with HEICO's IT Department.

72.    As a result of this, the Drive that Savaria used to download SSP's documents undeniably is property of SSP, because it is one of the few USB devices registered with HEICO's IT department and compatible with a limited number of SSP's computers.

**F.    Savaria's Misappropriation and Breach of Confidentiality will Cause SSP Irreparable Harm**

73.    Should Savaria further breach confidentiality and divulge or otherwise use the Materials he misappropriated from SSP, SSP will suffer additional harm that is incapable of being measured solely in terms of monetary damages, as it will be impossible to calculate the

injurious effects of Savaria's conduct upon SSP's business and future lost profits.

74.    Should the Court refuse to enforce the Defend Trade Secrets Act and confidentiality agreements and obligations designed to protect SSP's legitimate interests in its confidential information and goodwill, it will send a message to employees that they violate the law and contractually agreed obligations with impunity.

**COUNT I**
**VIOLATION OF THE DTSA, 18 U.S.C. § 1836**

75.    SSP incorporates its allegations in paragraph 1 through 76 above, as if fully set forth herein.

76.    The Materials, or, at a minimum, the vast majority of the Materials, that Savaria unlawfully took from SSP's possession constitute trade secrets, warranting protection under the DTSA.

77.    Savaria misappropriated SSP's trade secrets when he removed the Materials from SSP's protected computer systems, by copying them onto a USB flash drive for presently unknown purposes.

78.    Savaria's taking of SSP's trade secret electronic documents and files was not authorized, violated Savaria's contractual confidentiality obligations, and was not for any justifiable business purpose.

79.    SSP took reasonable measures to protect the secrecy of its Materials, including but not limited to, requiring SSP team members who may access the Materials to enter into confidentiality covenants, making the Materials only available from within SSP's password-protected information system, and only providing access credentials for SSP's information system to individual team members who had an actual need to access this information as a function of their employment and duties with SSP.

16

80.    The Materials include formulae, patterns, and compilations of information that SSP regularly utilizes in its business, and which were developed through great effort and expense, in terms of manpower, time and costs. If the Materials were to become known to a competitor, the competitor could immediately utilize them to compete against SSP within the silicone manufacturing industry.

81.    Specifically, the Materials include, but are not limited to, electronic plans and CAD drawings of products that SSP manufactures, together with information related to proprietary chemistry components of SSP's silicone- and plastic-based products. In combination with one-another, this information would allow a competitive enterprise with the right equipment to compete with SSP and produce copycat products almost immediately.

82.    Various of the Materials also include sensitive information belonging to third-parties, who provide SSP very limited access to their sensitive information to be used in the production of certain products.

83.    The improperly obtained Materials constitute trade secrets and Savaria's actions pose a real and actualized risk that he will and has misappropriated these secrets by using the information to his financial advantage, or the financial advantage of a competitor, or, perhaps most likely, by simply disseminating them publicly in order to maliciously injure SSP's business and professional standing with its customers, prospects and the industry at-large.

84.    SSP utilizes the Materials to manufacture products in New York, which it in-turn regularly sold to customers located outside of New York. Additionally, SSP received many of the Materials containing product plans and specifications from customers located outside of New York, for the purpose of developing products in New York, to then ship them

17

back outside of New York where they will be utilized throughout the country. The Materials that Savaria misappropriated are accordingly regularly utilized in interstate commerce, thus invoking the protections of federal law.

85.    Accordingly, SSP is entitled to an injunction, pursuant to 18 U.S.C. § 1836(b)(3)(A), (i) enjoining Savaria from using, accessing, disseminating, or copying any documents or electronic files that he obtained from SSP's premises or computer systems, (ii) requiring Savaria to immediately return in the USB flash drive that he utilized to misappropriate SSP's confidential and trade secret documents and information; (iii) requiring Savaria to produce all of his electronic devices to be forensically examined by a third-party investigator of SSP's choice; (iv) requiring Savaria to verify under oath in a written declaration or in open court, that he has not further disseminated any of SSP's confidential and trade secret documents and information; and (v) whatever other relief is justified and necessary to protect SSP's trade secrets.

## COUNT II
## BREACH OF CONTRACT

86.    SSP incorporates its allegations in paragraphs 1 through 76 as if fully set forth herein.

87.    The various policy acknowledgments that Savaria executed as a part of his employment include specific enforceable agreements between SSP and Savaria, wherein Savaria agreed that he would not misappropriate SSP's confidential information.

88.    Savaria's offer of employment and/or continued employment were specifically conditioned upon Savaria's agreement to retain the strict privacy of confidential information.

89.    Savaria breached his confidentiality obligations through his acts described herein, including but not limited to his acts in copying SSP's confidential and proprietary

documents and files from SSP's information system to a USB flash drive without any justifiable business purpose, in order to take the Materials outside of SSP's physical facility and protected information system.

90.    Savaria is liable for his conduct as breach of contract for violation of his confidentiality obligations even if the Materials, or portions thereof, may not qualify as trade secrets under the DTSA or New York common law.

91.    To prevent irreparable harm as a result of Savaria's breach of the Confidentiality Agreement, SSP is entitled to a TRO, to be followed by a preliminary and permanent injunction, to bring Savaria into full compliance with his contractual confidentiality obligations.

**COUNT III**
**REPLEVIN**

92.    SSP incorporates its allegations in paragraphs 1 through 76 as if fully set forth herein.

93.    The Materials, owned by SSP, are wrongfully retained by Savaria. Savaria came into possession of the Materials only by means of his employment with SSP and his assent to the terms of the Offer Letter, the Employee Manual, and Team Member Manual, which require Savaria to safeguard SSP's confidential, proprietary, and trade secret documents and information.

94.    Savaria does not own the Materials and does not otherwise have cause or reason to retain the Materials from SSP.

95.    The dissemination of the Materials would cause irreparable injury to SSP's business and professional standing with its customers, prospects, and the industry at-large, and thus, the Materials being left in Savaria's possession pose an imminent and catastrophic

19

risk to SSP.

96.    Plaintiff is therefore entitled to an Order mandating the immediate and complete return of all of SSP's property in Savaria's actual possession, including but not limited to, the Materials and the physical Drive he took from SSP's facility.

## PRAYER FOR RELIEF

**WHEREFORE,** SSP requests that the Court enter judgment in its favor against Savaria, as follows:

a.    Enter a TRO pursuant to Fed. R. Civ. P. 65 and 18 U.S.C. § 1836 (b)(3)(A), (i) enjoining Savaria from using, accessing, disseminating, or copying any documents or electronic files that he obtained from SSP's premises or computer systems; (ii) ordering Savaria to immediately return the USB flash drive that he utilized to misappropriate SSP's confidential and trade secret documents and information; (iii) ordering Savaria to produce all of his electronic devices to be forensically examined by a third-party investigator of SSP's choice; (iv) ordering Savaria to verify under oath in a written declaration or in open court, that he has not copied, or further disseminated any of SSP's confidential and trade secret documents and information; (v) ordering Savaria to return all other physical materials and objects that Savaria took from SSP's premises; and (vi) taking whatever other actions are necessary to bring Savaria into full and complete compliance with his legal obligations under the DTSA and his relevant confidentiality obligations to SSP;

b.    Order the complete return of all SSP property in Savaria's actual possession, including but not limited to, the physical Drive;

c.    Enter a preliminary and permanent injunction enjoining Savaria from any further violations of the DTSA or his contractual obligations, to the extent not already

20

permanently cured by the requested TRO;

    d.      Award compensatory damages in an amount to be proven at trial;

    e.      Award exemplary damages in an amount to be determined at trial;

    f.      Order that Savaria pay the full costs of suit, including SSP's attorneys' fees; and

    g.      Provide such other and further relief as this Court deems just and proper.

Dated: April 15, 2025

Respectfully submitted,

HARRIS BEACH MURTHA
CULLINA PLLC

By: */s/ Bradley M. Wanner*
Bradley M. Wanner (Bar No. 702244)
677 Broadway, Suite 1101
Albany, NY 12207
(518) 427-9700
bwanner@harrisbeachmurtha.com

SAUL EWING LLP

By: */s/ Peri A. Berger*
Peri A. Berger (Bar No. 703959)
Erik P. Pramschufer (admission pending)
1270 Avenue of the Americas, Suite 2800
New York, NY 10020
(212) 980-7200
peri.berger@saul.com
erik.pramschufer@saul.com

*Attorneys for Plaintiff Specialty Silicone
Products, Inc.*

21

## **VERIFICATION**

I, ADAM STILES, President and Chief Operating Officer of Specialty Silicone Products, Inc. ("SSP"), verify that I am authorized to make this verification on behalf of SSP: (i) I have read the foregoing Verified Complaint, and the facts alleged therein are true and correct to the best of my knowledge and belief; (ii) there is no single person employed or otherwise connected with SSP who has personal knowledge of all the facts and information set forth in the Verified Complaint; (iii) that said Verified Complaint was prepared with the assistance and advice of counsel and the assistance of various employees and representatives of SSP and its parent company, upon which I have relied; (iv) that subject to inadvertent or undiscovered errors, the Verified Complaint is based on SSP's knowledge and belief which is necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of the Verified Complaint; (v) that SSP reserves the right to amend the Verified Complaint if it appears at any time that omissions or errors have been made or that more accurate information is available; and (vi) that subject to these limitations, I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed via DocuSign on <u>4/14/2025</u>, in Saratoga County, New York.

DocuSigned by:

*Adam Stiles*

DD44DB3FDA80413...

ADAM STILES