**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPECIALTY SILICONE PRODUCTS, INC., | Case No. ___1:25-CV-0463 (AJB/PJE)___ |
| Plaintiff, | Civil Action |
| v. | |
| JASON SAVARIA, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

HARRIS BEACH MURTHA
CULLINA PLLC
Bradley M. Wanner (Bar No. 702244)
677 Broadway, Suite 1101
Albany, NY 12207
(518) 427-9700
bwanner@harrisbeachmurtha.com

SAUL EWING LLP
Peri A. Berger (Bar No. 703959)
Erik P. Pramschufer (admission pending)
1270 Avenue of the Americas, Suite 2800
New York, NY 10020
(212) 980-7200
peri.berger@saul.com
erik.pramschufer@saul.com

*Attorneys for Plaintiff Specialty Silicone Products, Inc.*

Dated: April 15, 2025

# **TABLE OF CONTENTS**

STATEMENT OF FACTS ....................................................................................... 3

ARGUMENT ......................................................................................................... 10

    A.    SSP Is Likely To Succeed On Its Claim That Savaria Violated the DTSA By Misappropriating SSP's Materials ............................................... 11

    B.    Savaria Breached His Confidentiality Obligations By Misappropriating SSP's Materials and Taking the Materials out of SSP's Facility. ................. 14

    C.    SSP Will Likely Suffer Irreparable Harm in the Absence of Injunctive Relief. ...................................................................................... 15

    D.    The Court Is Enabled to Grant SSP's Motion for TRO on an *Ex Parte* Basis Pursuant to Fed. R. Civ. P. 65, the DTSA, and the Court's Inherent Power, to Preserve Evidence and Ensure that Savaria Does Not Rashly Execute His Plan to Cause Damage to SSP Before All Parties Can Appear and Be Heard. ............................................................. 17

    E.    The Balance of the Equities and Public's Interest Weigh In Favor Entering the Requested Injunction. .............................................................. 19

    F.    SSP is Also Entitled to Injunctive Relief Pursuant to Article 71, section 7102 of the New York Consolidated Laws, Civil Practice Law and Rules which Provides for an Order of Seizure. ........................................... 20

CONCLUSION ..................................................................................................... 22

i

Due to the gravity of the circumstances set forth in its Verified Complaint and the Declarations of Adam Stiles and Enrique Oliva accompanying this Motion, Plaintiff Specialty Silicone Products, Inc. ("SSP") is compelled *ex parte* to seek a Temporary Restraining Order and Preliminary Injunction to prevent further irreparable harm being caused by Defendant Jason Savaria ("Savaria"), a disgruntled team member.[1] **Specifically, SSP has recently discovered that at the crack of dawn on Friday, April 4, 2025, Savaria unlawfully and without justification, copied <u>thousands</u> of documents from SSP's protected computer systems, including trade secrets, to a company-issued USB flash drive <u>that is now missing</u>.** After downloading the documents, Savaria unexpectedly clocked out for the day, hours before his shift was scheduled to end, and has not been back to work since.

The documents Savaria copied include highly-sensitive business information, including but not limited to, Computer-Aided Design ("CAD") drawings of many of SSP's products, financial and budgeting information, manufacturing and packaging processes, customer contracts, business reviews, and troves of other information that could be used by any number of SSP's competitors to quickly replicate a large portion of SSP's products and processes, and irreparably damage SSP's business advantages and goodwill.[2] The Materials that Savaria took would allow any business to compete almost instantly with SSP if they

---

[1] Savaria has been aggrieved for several months during which he expressed that he was unhappy with the direction of the company.  Savaria has been increasingly hostile toward SSP's management, despite the company's earnest intention to address his concerns in a logical and reasonable manner. Most recently, Savaria had to be formally disciplined because he publicly threatened to physically assault his Operations Manager, Alain Cotnoir. SSP does not believe that it is a coincidence that Savaria's recent behavior culminated in him stealing SSP's information to punish his employer by, for example, publishing the stolen Materials on the internet or selling them to a competitor, all of which will inflict maximum damage.

[2] The documents and files that Savaria took are generally referred to, as appropriate, as the "Materials."

obtained the right physical machinery, or if Savaria were to bring the information to one of SSP's competitors with the proper infrastructure already in place.

Particularly, Savaria took all of the necessary information, processes, and formulae to stand up a competing plastic injection molding operation (which accounts for a significant portion of the SSP's revenue, and a majority of its profit). On this specific point, the Materials include the precise part numbers for each component of SSP's proprietary combination of machinery, tools, and accessories and attachments for SSP's machinery and the automation of that machinery which was developed at great expense and through the assistance of consultants and years of industry experience, research and development. Furthermore, the Materials include SSP's proprietary and confidential formation of resins and pigments and specific settings and narrative process descriptions. All of this information is at the core of what distinguishes SSP from its competitors and is why SSP is a leading supplier in its industry who can produce at a large scale and with extremely tight tolerances.

Moreover, many of the Materials include sensitive third-party information. This information is typically provided to SSP for the purpose of facilitating SSP's manufacturing of certain products. As a result, Savaria's acts have not only put SSP's business at risk from unfair competition, but further have caused an immediate threat to SSP's goodwill and longstanding business relationships of those third parties. Should Savaria disseminate or sell the Materials, or attempt to manufacture these products, the ultimate business ramifications to SSP will be devastating.

Accordingly, SSP comes now to this Court in a manner of utmost urgency, seeking an extraordinary judicial remedy that only this Court can provide. To prevent this manifest injustice from getting worse, and return all of the parties to the *status quo*, SSP accordingly

2

requests a temporary restraining order ("TRO") followed by a preliminary injunction preventing Savaria from further misappropriating SSP's confidential and trade secret information, and requiring Savaria to return all copies of the Materials, if any have been made, to SSP's counsel, together with the physical Drive he stole from SSP. Following his doing so, SSP asks that the Court further order that Savaria immediately identify under oath, whether in a declaration, affidavit, or verbally in open court, that he has not already used, distributed, or published the Materials to third-parties. Additionally, SSP requests that the Court require Savaria to submit his electronic devices to a third-party forensic investigator to be selected by SSP for examination and verification that no other copies of the Materials have been retained. Of course, should these inquiries reveal that Savaria has already used or published the Materials to third-parties, SSP will seek other appropriate relief.

SSP respectfully requests that the issuance of this TRO be granted immediately, without notice, on an *ex parte* basis. Every minute that passes compounds the risk that Savaria will disseminate the Materials to third-parties, to the extent he has not already done so.

<u>**STATEMENT OF FACTS**</u>

In support of its Motion, SSP relies upon the facts set forth in its Verified Complaint, and the attached Declarations of Adam Stiles and Enrique Oliva, which are incorporated herein by reference. An abbreviated summary of the material facts underlying this Motion follows:

*SSP's Business & Savaria's Employment*

SSP is a silicone-based product manufacturer based in Saratoga County, New York, where its 83 team members work every day from SSP's production facility. Compl., ¶15. SSP's products include caps with silicone liners, EMI/RFI shielding elastomers, and custom

silicone compounds which are utilized in various end products ranging from Analytical Chemistry to EMI/RFI shielding gaskets. *Id.* at ¶ 16.  Very simply put, many of SSP's products fill the gap between or protect liquids or gases in chemical analyses, or electrical electronics in mission critical vehicles and equipment, and the exposed air (or space). *Id.* at ¶¶ 18–19. As just two examples, SSP's products include various types of o-rings, which are used to surround the electronics of an air-tight enclosure, and bonded caps used in chromatography analysis:



*See https://sspinc.com/emi-rfi-conductive-o-rings/* (last accessed April 13, 2025).



*See https://septasource.com/* (last accessed April 14, 2025).

While perhaps simple-looking at first blush, the proprietary nature of these products

4

derives from their chemistry together with the manufacturer's production processes. *Id.* at ¶ 18.  The types of silicone-based products that SSP creates are high yield and are designed to very tight tolerances. *Id.* This allows SSP's products to be utilized in extreme conditions, including space and aviation. *Id.* In essence, many of SSP's products serve the same basic function as putting weather stripping around a door to prevent the heat from escaping in the winter. But SSP's products do this under the most extreme conditions, in order to contain any number of volatile chemicals and protect electrical equipment from exposure to the elements in the air and space as well as electromagnetic radiowaves. *Id.* at ¶ 19. SSP's customers accordingly include many space and aviation firms, and SSP's products, while perhaps not the central focus of the average person's eye looking at an airplane, can be found across the world and throughout the atmosphere. *Id.* SSP derives much of its business value from its proprietary production processes, which allow SSP to produce its products efficiently and effectively among a field of competitors. *Id.* at ¶ 26. Thus, SSP's entire business depends upon being able to produce its products effectively to meet the customer's end-use at the lowest possible price. *Id.* at ¶ 26.

SSP is a wholly-owned subsidiary of HEICO Corporation ("HEICO"). *Id.* at ¶ 65. To protect SSP's proprietary, confidential and trade secret information, SSP's information and technology ("IT") systems and administration is overseen by HEICO, in accordance with HEICO's robust information security systems and restrictive policies and procedures. *Id.* at ¶ 66. As just one of its restrictive policies, SSP employees who have access to SSP's confidential information are all required to agree to abide by various contractual and policy-based terms restricting their use or dissemination of SSP's information. *Id.* at ¶ 67.

Savaria specifically acknowledged the protected nature of the Materials and agreed to

5

maintain their confidentiality. *Id*. at ¶¶ 30–39.  From the outset of his employment with SSP, Savaria signed several documents which contained unequivocal obligations to protect and not to disclose trade secrets, confidential and proprietary information of SSP, including but not limited to product design, marketing strategy, customer lists, pricing policies, and other related information. *Id*. Savaria also acknowledged receipt of SSP's Fraud Policy which defines fraud to include the misuse or stealing of intangible (proprietary product, customer information) assets and specifically states that the misuse or stealing of such assets can lead to significant losses to SSP. *Id*. at ¶ 34.

Savaria is one of 83 team members at SSP's production facility, where he works as a machinist. *Id*. at ¶¶ 2, 15, 29. Savaria's job duties include operating industrial toolmaking machinery to create SSP's silicone and plastic based products, utilizing digital CAD drawings and other electronic information. Stiles Decl., ¶ 24. The CAD drawings and all other electronic information that Savaria uses are securely stored on SSP's servers and computer drives. *Id*. To operate the machinery, Savaria utilizes a USB flash drive to take CAD drawings and other information stored on SSP's protected computer systems, to load this information into the machine that actually produces the product. *Id.* As a result of his position and job duties, Savaria is among the approximately 60% of SSP's total workforce that has access to SSP's information system and internally shared data drives. Oliva Decl., ¶¶ 21–22. Additionally, the specific computer that Savaria regularly uses to download and upload files to and from a USB drive is one of the few computers on SSP's premises that are enabled to use USB ports at all (described further below). Compl., ¶ 70–72; Oliva Decl., ¶¶ 13–18.

***Savaria's Misappropriation of SSP's Materials***

On April 4, 2025, Savaria got to work early for his 6:00 AM shift, clocking into his

shift at 5:43 AM. Compl., ¶ 51.  Security footage reveals that shortly after this, Savaria began to do work at a computer located on the floor of the production facility. *Id*. at ¶ 50. While sitting at the computer on the shop floor, in the span of about eighteen minutes between 6:10 AM and 6:28 AM, Savaria copied to a company-issued USB flash drive (*i.e.*, the Drive) **2,065** individual digital documents (*i.e.*, the Materials). *Id*.; Oliva Decl., ¶¶7–10. About an hour after copying the Materials, Savaria left the plant (hours prior to the end of his scheduled shift) having performed little actual "work" to SSP's knowledge. Compl., ¶ 51. SSP's security cameras from the time while Savaria was walking around the plant on the morning of April 4, 2025, show him carrying around the Drive, but do not show him putting it back in his workspace or any other location at the facility. *Id*. at ¶ 52. The Drive Savaria copied the Materials to is now missing, and nowhere to be found on SSP's premises. *Id*. at ¶ 53; Stiles Decl., ¶ 9.

The Materials Savaria copied from SSP's computer system include CAD drawings of many of SSP's products, financial and budgeting information, manufacturing and packaging processes, customer contracts, business reviews, and troves of other information that could be used by any number of SSP's competitors to quickly replicate SSP's products and processes. Compl., ¶¶ 54–56; Oliva Decl., ¶ 11; Stiles Decl., ¶¶ 21–22. The Materials also include research and development materials and proprietary product chemistry information related to SSP's manufacturing processes.  Compl., ¶ 81; Stiles Decl., ¶ 21.

Moreover, many of the Materials include sensitive third party information. Compl., ¶ 60; Stiles Decl., ¶ 28. Savaria's acts have not only put SSP's business at risk of unfair competition, but further have caused an immediate threat to SSP's goodwill and longstanding business relationships with those third parties. Compl., ¶ 63; Stiles Decl., ¶ 26.  Should Savaria

7

disseminate or sell the Materials, or attempt to manufacture these products, the ultimate business ramifications to SSP will be devastating. Compl., ¶ 64.

While it is impossible to describe each and all of the 2,000+ Materials that Savaria copied to the Drive, the most commercially concerning information that Savaria took include SSP's proprietary information related to its Laboratory Products line. Stiles Decl., ¶¶ 13, 21. Particularly, Savaria took all of the necessary information, processes, and formulae to stand up a competing plastic injection molding operation (which is a key component in support of a significant portion of the SSP's revenue, and a majority of its profit). *Id.* at ¶¶ 13–15, 21. On this specific point, the Materials include the precise part numbers for each component of SSP's proprietary combination of machinery, tools, and accessories and attachments for SSP's machinery and the automation of that machinery which was developed at great expense and through the assistance of consultants and years of industry experience, research and development. *Id.* at ¶ 18. Furthermore, the Materials include SSP's proprietary and confidential formulation of resins and pigments and specific settings and narrative process descriptions. *Id.* at ¶ 21. All of this information is at the core of what distinguishes SSP from its competitors and is why SSP is a leading supplier in its industry who can produce products at a large scale and with extremely tight tolerances. *Id.* at ¶ 17; Compl., ¶ 23–26.

The Materials Savaria took, some individually and others in the aggregate manner in which they were taken, are highly valuable and confidential, as they include a literal roadmap for how to compete with SSP and replicate its manufacturing processes. Compl., ¶ 4. **Nobody** outside of SSP has the overwhelming majority of the Materials, with the only exceptions being some very limited number of SSP's relevant customers. *Id.* at ¶ 62; Stiles Decl., ¶ 30.

8

*SSP's Security Measures in Place to Protect its Confidential Information*

SSP's security procedures include requiring all individuals who need to access SSP's computer system to utilize a specific login and password. Compl, ¶ 68; Oliva Decl., ¶¶ 19–20. Among the approximately 83 team members working presently at SSP, only 49 have login credentials to access SSP's shared information systems. Oliva Decl., ¶ 21. Access to SSP's shared information system is strictly limited only to those who have a legitimate business need to access the system. *Id.* at ¶ 22; Compl., ¶ 68.

In addition to limiting access generally to the system itself, SSP implements a litany of other security measures to protect its confidential information and trade secrets that are stored on shared storage systems. Compl., 69. This includes, but is not limited to, maintaining an active firewall to prevent outside infiltration, and blocking access to commonly used cloud-based storage systems (*e.g.*, Google Drive, DropBox, iCloud) to prevent employees from digitally transferring documents from within the system to any personal accounts. *Id.*; Oliva Decl., ¶ 23. Additionally, SSP has active monitoring and alerts in place to prevent employees from exporting data outside of its protected systems or approved workflows. Compl., ¶ 69; Oliva Decl., ¶ 23.

As described above, SSP does utilize USB flash drives in a limited capacity in the ordinary course of business to transfer information from a computer system into its machinery where SSP's products are created. With the exception of a few members of SSP's management's computers, these computers and other machines where USB devices are actively used are the **only** computers on premises where USB devices are allowed. Compl., ¶¶ 70-71; Oliva Decl., ¶¶13-15. USB devices are digitally or physically prevented from being used on any of SSP's other computers, which do not have a direct manufacturing-related need

9

to use this type of storage equipment. Compl., ¶ 70; Oliva Decl., ¶ 13. Additionally, even on the very limited number of computers where USB devices are able to be used, SSP and HEICO utilize a computer system to block all USB devices, except those with specific serial numbers pre-registered with HEICO's IT team. Compl., ¶ 70; Oliva Decl., ¶¶ 12, 17. In practical effect, this means that even though a limited number of computers on SSP's premises allow for the use of USB devices, if someone were to utilize an unregistered USB flash drive they bought somewhere else, it would not work on SSP's computer. Oliva Decl., ¶ 18.

It is extremely difficult to take information out of SSP's protected system, unless someone were to (a) take the actual, physical computer off premises; or (b) as Savaria did, steal a company-issued flash drive that is registered with HEICO's IT team, and copy the documents from one of the very few computers on premises where it would work.

**ARGUMENT**

By this Motion, SSP seeks an Order pursuant to Fed. R. Civ. P. 65, entering a TRO enjoining Savaria from further breaching his legal obligations under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and his confidentiality agreements; and further ordering that Savaria (a) immediately return to SSP's counsel all copies of the Materials, including the physical Drive, that he stole from SSP, (b) submit his electronic devices to a third-party forensic investigator to be selected by SSP, and (c) affirm in a sworn declaration or in open court, that he has not otherwise disseminated, utilized or copied any of the Materials taken from SSP.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This same standard applies to applications for a TRO. *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 124 (N.D.N.Y. 2022). Each of these elements is readily demonstrated in the present application.

> **A.    SSP Is Likely To Succeed On Its Claim That Savaria Violated the DTSA By Misappropriating SSP's Materials**

The DTSA defines a "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- **(A)** the owner thereof has taken reasonable measures to keep such information secret; and **(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information …"

18 U.S.C. § 1839(3).

Here, troves of the Materials squarely fit within the categories of documents qualifying for trade secret status, because they include SSP's production designs, associated manufacturing processes and financial information. Compl., ¶ 54. *See Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *1 (2d Cir. Mar. 9, 2022) (summary order) (finding that where the information at-issue concerns financial, scientific or technical information, the court's trade secret inquiry turns on the value of the information and the efforts to maintain its secrecy). Moreover, courts regularly find that customer-specific information, including identities, pricing, contract terms and other information not generally known to the public may qualify as trade secrets. *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020) (collecting cases).

11

In determining whether reasonable measures are put in place to protect digital information to qualify for protection under the DTSA, courts "generally look to whether confidentiality or nondisclosure agreements are in place and whether the information is guarded by physical- or cyber-security protections." *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 380 (N.D.N.Y. 2021) "What measures are 'reasonable' must depend in significant part on the nature of the trade secret at issue." *Id.* Here, SSP took far more than "reasonable" measures to protect its Materials from misappropriation or theft from both internal and external threats, including by (1) limiting electronic access to its protected computer systems and shared storge drives to only those employees who needed access for their job duties; (2) implementing robust cyber security protocols, including only allowing a limited number of computers to accept USB flash drives, and even for the ones that do, only allowing them to utilize specific drives owned by SSP and registered with HEICO's IT department; (3) maintaining industry-leading external cyber protections such as firewalls and automated data monitoring; and (4) requiring team members to agree to HEICO's confidentiality and privacy protection policies, and confidentiality agreements, as a condition of employment and access to the Materials. Oliva Decl., ¶¶ 13–14, 17, 19–23; Compl., ¶¶ 67–71. Accordingly, this element for qualifying the Materials as trade secrets is met.

Finally, as further described in the Declaration of Adam Stiles, the Materials derive independent value from not being known outside of SSP. These Materials include valuable business information specifically related to SSP's business, research, development and production of products. Compl., ¶ 54. With the right toolmaking machinery, the Materials provide a literal roadmap for how to develop copycat products competitive with SSP, therein eliminating SSP's competitive advantage in the market. *Id*. at ¶¶ 4, 55–56.  Of particular note,

the Materials Savaria misappropriated include virtually all of the information a competitor would need to replicate SSP's plastic injection molding operation; which, is a proprietary process that SSP has developed, and which differentiates SSP from all (or mostly all) of its competitors. Stiles Decl., ¶¶ 12, 21.  This information coming into the hands of a competitor with the resources to obtain a plastic injection machine —something that sells for about $250,000 on the open market— would virtually eradicate SSP's competitive standing among its peer firms. *Id*. at ¶ 22.

On the other side of this same coin, any misappropriation or publication of the Materials would have a devastating effect on SSP's business, including tarnishing SSP's goodwill and public image of dependability and security, particularly as it relates to any third-party sensitive information that may be included. Compl., ¶ 63, 74; Stiles Decl., ¶ 28. As a result, this final element satisfying the Materials as trade secrets is also met.

With this, the question turns to whether Savaria violated the DTSA by stealing the Drive to take the Materials out of SSP's premises and off the secured computer systems. "Misappropriation" under the statute means, *inter alia*, "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* at (5)(A). "Improper means" includes obtaining the trade secrets through theft, or in violation of any "duty to maintain secrecy" *Id.* at (6)(A).

Under this definition it is patently clear that Savaria misappropriated the Materials from SSP. Savaria acquired the Materials from SSP's protected computer systems in direct violation of his confidentiality obligations and SSP's policies as further discussed below in Section B, utilizing the Drive, which he also stole from SSP. Although SSP presently has no information to demonstrate that Savaria has yet used or further disseminated SSP's trade

13

secrets, this is immaterial to finding that Savaria knowingly misappropriated the Materials based upon the statute, which merely requires that one knowingly **acquire** trade secrets through improper means. *See eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 494 (S.D.N.Y. 2024) (collecting cases, and finding that misappropriation under the DTSA may be found when an employee sends themselves trade secret information outside of their employer's protected computer system even if not yet for a competitive purpose, if they do so in violation of a contractual duty to maintain privacy for an improper or illegitimate purpose).

There is no legitimate reason for Savaria to have stolen the Drive and copied **thousands** of digital files, and then taken them outside of SSP's facility and protected IT environment. As a result, SSP is likely to prevail on its claim against Savaria for misappropriation under the DTSA.

> **B.      Savaria Breached His Confidentiality Obligations By Misappropriating SSP's Materials and Taking the Materials out of SSP's Facility.**

As part of the hiring and onboarding process with SSP, Savaria received and signed the SSP – Employee Manual Version 13 – 1/16/2019 The Employee Manual contains a specific page titled "Receipt and Acknowledgment of Employee Manual" which Savaria signed on April 9, 2019. Compl., ¶ 30. In the Receipt and Acknowledgment of Employee Manual, SSP confirms the importance of protecting its confidential information, requiring the team member to again confirm that:

> I am aware that during the course of my employment confidential information will be made available to me, for instance, product design, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is proprietary and critical to the success of SSP and must not be given out or used outside of SSP's premises or with non-SSP employees.  In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

14

Compl., ¶ 33.

Th Employee Manual also provides as an addendum a separate confidentiality agreement. Compl., Ex. B. The addendum states in bold "THIS AGREEMENT IS A LEGAL DOCUMENT AND THE EMPLOYEE IS ADVISED THAT HE OR SHE MAY SEEK LEGAL ADVICE BEFORE AGREEING TO ITS TERMS." *Id.* The addendum then provides "Employee shall take all reasonable action, that SSP deems necessary or appropriate, to prevent unauthorized use or disclosure of or to protect SSP's interests in the Confidential Information." *Id.* The addendum further states "any documents that contain Confidential Information shall be turned over to SSP and no copies or abstract therefore shall be the Employee upon demand or SSP…" *Id.* Savaria signed the Addendum to the Employee Manual on April 9, 2019. *Id.*; Compl., ¶ 32. Savaria's theft of SSP's trade secrets, the taking of the Materials outside of SSP's facilities and his ongoing retention of the Materials is a breach of his contractual confidentiality obligations.[3]

**C.    SSP Will Likely Suffer Irreparable Harm in the Absence of Injunctive Relief.**

It is axiomatic that any movant for immediate injunctive relief must demonstrate not only that it is likely to succeed in its case in-chief, but that it will suffer irreparable harm in the absence of an injunction such that it is appropriate to award relief without the benefit of the full litigation process. The gravamen of this remedy is why the Second Circuit has regularly stated that "[i]reparable harm is the single most important prerequisite for the issuance of a

---

[3] As an Appendix, the Employee Manual also contains a Fraud Policy which defines Fraud to include the "misuse or stealing of tangible (cash, inventory) and intangible (proprietary product, customer information) assets that can lead to significant losses to the Company." Compl., ¶ 34; Compl., Ex. C. Savaria acknowledged receipt of the Fraud Policy on a yearly basis. Compl., ¶ 34. The actions described herein violate the Fraud Policy as Savaria obtained the Materials for a non-work purpose and under false pretenses.

15

preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)) (cleaned up). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

In the context of trade secrets, courts presume that a plaintiff will suffer irreparable harm following a misappropriation "in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). *See also IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm.").

Here, even without the benefit of any presumption, it is apparent that SSP stands to suffer irreparable harm in the absence of an injunction. Although SSP presently has no ability to know whether or how Savaria has actually used the Materials, SSP stands to suffer harm from Savaria's acts for at least two reasons. *First*, as discussed further in the Declaration of Adam Stiles, Savaria could easily, at any moment, use the Materials to compete with SSP's business if he were to obtain access to the right machinery; or, conceivably, Savaria could utilize the Materials to gain favor with a competitor in exchange for lucrative employment opportunities. Stiles Decl., ¶27. *Second*, and perhaps most likely in the circumstance at hand, Savaria's history strongly demonstrates that he has the motivation to do whatever is in his

16

power to inflict damage on SSP by disseminating these materials to third-parties or even publishing them on the internet, even if doing so was not for any direct pecuniary gain. Compl., ¶¶ 5–7. The harm from Savaria doing this would be catastrophic, not just in terms of providing SSP's trade secrets information to a competitor allowing them to compete against the company; but also, by irrevocably tarnishing SSP's goodwill with its customers and other stakeholders, who rely upon SSP to safeguard their information and intellectual property. *See United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002) ("In general, a loss of privacy and injury to reputation are difficult to calculate."). Such concerns unless immediately redressed risk the going concern of SSP's entire business, beyond simple unfair competition and price-cutting. *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("In contrast, where we have found irreparable harm, the very viability of the plaintiff's business, or substantial losses of sales beyond those of the terminated product, have been threatened.") (internal citations omitted).

The concerns raised by Savaria's grossly unlawful acts of misappropriation threaten irreparable injury to SSP's business at virtually every level. Accordingly, the Court should find that SSP has made this requisite showing and enter the requested injunctive relief to stop any further damage and return the parties to the *status quo* as it existed prior to Savaria's unlawful acts.

**D.    The Court Is Enabled to Grant SSP's Motion for TRO on an *Ex Parte* Basis Pursuant to Fed. R. Civ. P. 65, the DTSA, and the Court's Inherent Power, to Preserve Evidence and Ensure that Savaria Does Not Rashly Execute His Plan to Cause Damage to SSP Before All Parties Can Appear and Be Heard.**

This court has the inherent authority to make appropriate evidentiary rulings and to prevent destruction or spoliation of relevant evidence. *In re Chevron Corp.*, 736 F. Supp. 2d 773, 787 (S.D.N.Y. 2010) ("While courts almost certainly have inherent authority to order

17

those before them to preserve potentially relevant evidence, that authority ordinarily should not be used in the absence of some substantial basis for believing that it would serve a useful purpose.").

Moreover, federal courts also are empowered to grant a seizure order to preserve evidence and assets pursuant to the DTSA (18 U.S.C. § 1336(b)), and Rule 65 allows courts to craft appropriate relief that is tailored to fit the specific legal violations, in order to carry out the effect of the relevant statutes. *See Faiveley*, 559 F.3d at 119.

For example, in *Chanel, Inc. v. Conklin Fashions, Inc.*, No. 3:15-CV-893 (MAD/DEP), 2015 Bloomberg 268151 (N.D.N.Y. Aug. 14, 2015), the Court ordered on an *ex parte* basis in a Lanham Act matter that the United States Marshal shall carry out a seizure, and ordered that defendant shall forfeit "(1) all counterfeit products, means of making counterfeit products such as manufacturing or packing equipment, molds, matrices, computers, computer software, or machinery designed for the purpose of making or packaging counterfeit products, and packaging bearing the Chanel marks or any other mark substantially indistinguishable of one or more of the Chanel marks, (2) all documents and records reasonably appearing to document or relate to the importation, purchase, acquisition, manufacture, insurance of, advertising, promotion, sale, offering for sale, distribution, and transfer of such products and packaging of the Chanel marks or substantially indistinguishable designations of or for any of the Chanel marks, including, but not limited to, computer disks, CD ROMs, computer hardware, other magnetically or electronically stored information."  In so finding, the *Chanel* court found that any other remedy (including a TRO on notice) would be insufficient, including because if notice were to be proved relevant evidence may be destroyed and further profits would be lost. *Id.*

18

The DTSA expressly allows for civil seizures as well, including where the applicant demonstrates that "an immediate and irreparable injury will occur." 18 U.S.C. § 1836(b).[4]

Here, in the span of only the past few months and weeks, Savaria has expressed a growing resentment toward SSP and its management. Compl., ¶ 5–7, 40–48. This resentment, coupled with the specific Materials that he stole, presents a genuine and material risk that should Savaria be provided notice of this application, he will destroy, disseminate or otherwise further misappropriate SSP's trade secrets. Again, as discussed in the Declaration of Adam Stiles, the specific information that Savaria stole related to SSP's plastic mold injection operation would allow virtually any of SSP's competitors —including one of its primary competitors located close to SSP's facility— to replicate SSP's proprietary processes almost instantly. *See* Stiles Decl., ¶¶19, 21, 22, 27. Accordingly, while SSP acknowledges that true *ex parte* relief is an extraordinary remedy reserved for only the most egregious and volatile situations, such a remedy is appropriate based upon the facts of this case to reasonably protect SSP's confidential and trade secret information.

**E.    The Balance of the Equities and Public's Interest Weigh In Favor Entering the Requested Injunction.**

The balance of the equities weighs decidedly in favor of granting the requested injunction, particularly considering the magnitude of the irreparable harm SSP will suffer in its absence, together with the fact that any harm to Savaria from being enjoined is solely as a result of his own illegal activity. *See IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 242 (E.D.N.Y. 2024) (collecting cases, and observing that "the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the

---

[4] To be clear: SSP is not requesting a "seizure" *per se* under the DTSA, to be carried out by the Marshal. Rather, SSP seeks an *ex parte* TRO.

defendant's own illegal activity.").

As a final step under *Winter* before an injunction can issue, the Court must find that the public's interest will not be "disserved by granting preliminary injunctive relief." *Intertek*, 443 F. Supp. 3d at 347 (citing *U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n. 1 (2d Cir. 2012)). The public's interest here is best served by holding Savaria to his legal obligations under the DTSA and his Confidentiality Agreement. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015) ("[T]he public interest here is served by the enforcement of the parties' lawful agreement …"); *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014) (finding that when the dispute is between private parties "the public interest would be advanced by such an injunction, because … such an injunction would tend to encourage parties to abide by their agreements"). With this final element satisfied, the Court should issue the requested TRO and preliminary injunction, for the reasons set forth herein.

**F.    SSP is Also Entitled to Injunctive Relief Pursuant to Article 71, section 7102 of the New York Consolidated Laws, Civil Practice Law and Rules which Provides for an Order of Seizure.**

Pursuant to Rule 64 of the Federal Rules of Civil Procedure, "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). One of those available remedies is an order of seizure pursuant to Article 71, section 7102 of the New York Consolidated Laws, Civil Practice Law and Rules ("C.P.L.R."). *See Licensing Servs. Int'l v. Howe Chem. Co., Inc.*, No. CV-93-2556, 1995 WL 744996, at *1 (E.D.N.Y. Dec. 6, 1995) (a "motion for an order of seizure is governed by New York law. Fed. R. Civ. P. 64"); *Am. Honda Fin. Corp. v. V.M. Paolozzi*

*Imports, Inc.*, No. 710-CV-0155 (GTS/ATB), 2010 WL 1189342, at *1 (N.D.N.Y. Mar. 24, 2010) (issuing order of seizure pursuant to CPLR 7102 and Fed. R. Civ. P. 64); *Nissan Motor Acceptance Corp. v. Dealmaker Nissan, LLC*, No. 7:09-CV-0196 (GTS/GJD), 2009 WL 667452, at *1–2 (N.D.N.Y. Mar. 11, 2009) (same).

Pursuant to C.P.L.R. 7102, when applying for an order of seizure, the movant "shall clearly identify the chattel to be seized" and shall state:

1. that the plaintiff is entitled to possession by virtue of facts set forth;
2. that the chattel is wrongfully held by the defendant named;
3. whether an action to recover the chattel has been commenced, the defendants served, whether they are in default, and, if they have appeared, where papers may be served upon them;
4. the value of each chattel or class of chattels claimed, or the aggregate value of all chattels claimed;
5. if the plaintiff seeks the inclusion in the order of seizure of a provision authorizing the sheriff to break open, enter and search for the chattel, the place where the chattel is located and facts sufficient to establish probable cause to believe that the chattel is located at that place;
6. that no defense to the claim is known to the plaintiff; and
7. if the plaintiff seeks an order of seizure without notice, facts sufficient to establish that unless such order is granted without notice, it is probable the chattel will become unavailable for seizure by reason of being transferred, concealed, disposed of, or removed from the state, or will become substantially impaired in value.

Plaintiff's accompanying submissions satisfy the requirements of C.P.L.R. 7102, and Plaintiff is thus entitled to an order of seizure.

Pursuant to the Offer Letter, the Employee Manual, and Team Member Manual, Savaria agreed to safeguard SSP's confidential, proprietary, and trade secret documents and information. Despite his agreements, Savaria utilized the Drive to copy and steal the Materials from SSP's protected network.  As a result of Savaria's violation of the terms of his employment agreements and his theft of SSP's property, SSP is entitled to an order to obtain the Drive and repossess the Materials. *See Hudson Motors P'ship v. Crest Leasing Enterprises, Inc.*,

845 F. Supp. 969, 980 (E.D.N.Y. 1994) (An "order of seizure is available if the affidavit in support of such an application establishes that the plaintiff is entitled to possession by virtue of the facts set forth and that the chattel is wrongfully held by the defendants.").

In accordance with CPLR 7102(c)(3), SSP commenced this action to, *inter alia*, recover the Materials. SSP seeks the entry of a temporary restraining order on an *ex parte* basis, in accordance with CPLR 7102(c)(7), because Saravia stole the Materials, has demonstrated ill will toward SSP and its leadership team, and it is reasonably foreseeable that he will disseminate the Materials to third-parties or use them for some other improper purpose. Such dissemination and/or use would cause irreparable harm to SSP and its customers.

## CONCLUSION

For the reasons set forth herein, SSP respectfully requests that the Court enter a TRO, followed by a preliminary injunction, pursuant to Fed. R. Civ. P. 65, consistent with the proposed form of order submitted with this application.

Dated: April 15, 2025

Respectfully submitted,

HARRIS BEACH MURTHA
CULLINA PLLC

By: */s/ Bradley M. Wanner*
Bradley M. Wanner (Bar No. 702244)
677 Broadway, Suite 1101
Albany, NY 12207
(518) 427-9700
bwanner@harrisbeachmurtha.com

[additional counsel to follow]

22

SAUL EWING LLP

By: */s/ Peri A. Berger*
Peri A. Berger (Bar No. 703959)
Erik P. Pramschufer (admission pending)
1270 Avenue of the Americas, Suite 2800
New York, NY 10020
(212) 980-7200
peri.berger@saul.com
erik.pramschufer@saul.com

*Attorneys for Plaintiff Specialty Silicone Products, Inc.*

23